[Cite as *State v. Kelley*, 2011-Ohio-4999.]

STATE OF OHIO )  IN THE COURT OF APPEALS
)ss:  NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT )

| STATE OF OHIO | C.A. No. 24660 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DAVID A. KELLEY, SR. | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. 2008-08-2694(A) |

DECISION AND JOURNAL ENTRY

Dated: September 30, 2011

CARR, Presiding Judge.

{¶1} The appellant, David Kelley, Sr., appeals the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} On August 28, 2008, the Summit County Grand Jury indicted Kelley on one count of rape in violation of R.C. 2907.02(A)(2)/(A)(1)(c), a felony of the first degree; one count of aggravated burglary in violation of R.C. 2911.11(A)(1), a felony of the first degree; and one count of possession of marijuana in violation of R.C. 2925.11(A)(C)(3), a minor misdemeanor. All charges stemmed from an incident which occurred on August 7, 2008. The substantive facts are discussed below. Kelley pleaded not guilty to the charges and the matter proceeded to trial. On January 9, 2009, a jury found Kelley guilty of rape and aggravated robbery. The charge of possession of marijuana was dismissed on the motion of the State. The trial court issued its

sentencing entry on February 18, 2009. Kelley was sentenced to a total of fourteen years imprisonment. Kelley was also classified as a Tier III sex offender.

{¶3} On March 11, 2009, Kelley filed a notice of appeal. On appeal, Kelley raises three assignments of error.

II.

## ASSIGNMENT OF ERROR I

"THE TRIAL COURT VIOLATED DAVID KELLEY'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN, IN THE ABSENCE OF SUFFICIENT EVIDENCE, THE TRIAL COURT CONVICTED MR. KELLEY OF RAPE [IN VIOLATION OF THE] FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION."

{¶4} In his first assignment of error, Kelley argues that his rape conviction was not supported by sufficient evidence. This Court disagrees.

{¶5} In support of his argument, Kelley argues that "the evidence fails to establish that [he] engaged in sexual conduct with D.M. by compelling her to submit by force or threat of force, or that [he] engaged in sexual conduct with D.M. when her ability to consent was substantially impaired because of a mental or physical condition." Kelley distinguishes this case from circumstances confronted by the Eighth District in *State v. Clark*, 8th Dist. No. 90148, 2008-Ohio-3358 and *State v. Younger*, 8th Dist. No. 86235, 2006-Ohio-296, where the respective victims were asleep when the sexual conduct began. Kelley notes that, "[i]n fact, it was her thoughts and concerns about her surroundings, and what she had heard before the sexual conduct began, that caused her to turn around and realize that the person engaging in sexual conduct with her was not her boyfriend." Thus, according to Kelley, the State did not prove beyond a reasonable doubt that D.M. was compelled to submit to force or the threat of force. Kelley

further argues that because his conviction for aggravated robbery was predicated upon the offense of rape, that conviction must be overturned as well.

{¶6}    Kelley was convicted of rape under R.C. 2907.02(A)(2)/(A)(1)(c), which states:

"(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

"* * *

"(c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

"(2) No person shall engage in sexual conduct with another when the offender purposefully compels the other person to submit by force or threat of force."

{¶7}    The law pertaining to a challenge to the sufficiency of the evidence is well settled:

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Galloway* (Jan. 31, 2001), 9th Dist. No. 19752.

The test for sufficiency requires a determination of whether the State has met its burden of production at trial. *State v. Walker* (Dec. 12, 2001), 9th Dist. No. 20559; see, also, *State v. Thompkins* (1997), 78 Ohio St.3d 380, 390.

{¶8}    Ohio courts have held that "[a]s long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *State v. Pordash*, 9th Dist. No. 04CA008480, 2004-Ohio-6081, at ¶12, quoting *State v. Eskridge* (1988), 38 Ohio St.3d 56, 59, citing *State v. Martin* (1946), 77 Ohio App. 553. This Court has further

recognized that "[t]he relationship of the parties is a relevant fact when examining whether the element of force has been proven." *Pordash* at ¶12, citing *Eskridge*, 38 Ohio St.3d at 58.

{¶9}   The State presented evidence at trial to demonstrate that while Eric Massey was engaging in sexual relations with a woman who had accompanied Kelley to Akron, Kelley entered Massey's house and raped Massey's girlfriend, D.M.   More than twelve witnesses testified on behalf of the State in this matter.   In addition, the State presented a significant amount of evidence in the form of exhibits.   Kelley's wallet and identification were found at the crime scene.   Also found at the crime scene was a condom containing the DNA of Kelley, D.M., and Massey.

{¶10} In addition to the physical evidence found at the house, the testimony of two witnesses was crucial to demonstrating that Kelley used force or the threat of force to engage in sexual relations with D.M.   Massey, a cousin of the defendant and the boyfriend of the alleged victim, D.M., testified as follows.   Massey lives at the house located at 1047 Frederick Blvd., in Akron, Ohio.   Massey indicated that D.M. was staying with him temporarily while she was relocating to a different permanent residence.   Massey had not seen Kelley, who lives in the Chicago area, since the funeral of Massey's mother in May 2008.   Massey and D.M. returned to his residence on the night of August 7, 2008, after they had been out drinking.   When he arrived home, Massey received a phone call from Kelley between 10:00 and 10:15 p.m.   Kelley, who is employed as a truck driver, informed Massey that he was making a delivery in Akron and that he would be in town for the night.   Kelley further indicated that he was on the east side of the city and that he was not familiar with his surroundings.   Massey testified that he told D.M. that his cousin was lost and he was going to meet him.

{¶11} Massey met Kelley between 10:30 and 10:45 p.m. at the Popeye's Restaurant on East Arlington Street in Akron. Massey's cousin "Creesh," as well as one of her friends, was also with the Kelley. Massey approached the group and started talking with them. Massey had brought a beer with him and he testified that he drank the beer in the parking lot. When asked if he was intoxicated at the time, Massey answered, "I had a buzz on[.]" A woman named Crystal Washington had also accompanied Kelley to Akron. Massey and Washington had engaged in sexual relations on prior occasions. Massey testified that he was not aware that Washington had made the trip when he first arrived. Massey and Kelley eventually moved their trucks across the street to a dock where they could be parked. Massey testified that he got into Kelley's truck because he had never been inside and he wanted to check it out. Massey testified that he was surprised to find Washington in the truck and he learned that "they [had brought] her down to surprise me." While Massey was admiring Kelley's truck, Kelley asked Massey to borrow Massey's truck so he could go get something to eat. Massey indicated that he allowed Kelley to "use [his] truck to go down the street." Massey testified that his house keys were on the same key ring as his car keys. Massey proceeded to have sexual relations with Washington in the truck. Massey testified that he recalled being in the truck with Washington for 45 minutes to an hour but it could have been longer because, at one point, he fell asleep. Massey further testified that Washington woke him up and told him Kelley had called to inform Massey that Creesh would pick him up to take him home. On the way home, Creesh stopped at a McDonald's where Massey saw Kelley. When Massey asked Kelley why he did not return the truck, Kelley indicated that the truck was in his driveway because he did not have enough gas to return it. Kelley returned the keys to Massey. When Massey eventually arrived home, he found the police at his house. Massey testified that he thought Kelley was "going to go right down the street to a

store, a restaurant, get something to eat, and come right back." When asked why he had such an impression, Massey testified, "Because that was discussed before I gave him the keys." Massey did not know that Kelley would go to his house. Massey further testified he and Kelley had not set up "a swap" and that he did not have an agreement with Kelley that he could have sex with D.M.

{¶12} D.M., the alleged victim in this case, testified as follows. D.M. was staying with Massey on August 7, 2008, because she had just sold her home and her new permanent residence was not going to be ready until August 9, 2008. D.M testified that she and Massey had "just really started dating in June" but they had known each since junior high school. On the night of August 7, 2008, D.M. and Massey returned to the house just as it got dark. D.M. testified that she heated up some greens that she had prepared for dinner on a previous night and she and Massey ate together. While they were eating, Massey received a phone call. D.M. testified as follows:

> "[H]e said that it was his cousin, Creesh needed – ran out of gas. It didn't seem like he was talking to her. It was like, 'Well, where she at? Okay. Well, I'll be there in a second,' kind of thing.

> "And then he said his cousin Creesh had ran out of gas, and he had to go and give her some gas."

D.M. testified that Massey then left the house shortly after 10:00 p.m. D.M. testified that she was under the impression he was going to help his cousin. After Massey left, D.M. finished her food, turned on a movie, and then fell asleep thereafter. D.M. testified that when she fell asleep, Massey was still gone. D.M. further testified that, while she was staying with Massey, she was sleeping on an electric air mattress in one of three second-floor bedrooms. D.M. testified that the two other bedrooms were not used because Massey's mother had passed away in one and the other had a lot of things in it.

{¶13} Later that night, D.M. awoke when the bedroom door opened. D.M. testified that she assumed it was Massey. D.M did not sit up when the door opened. D.M. testified, "I didn't want to be, like, anxious. I don't know. I was still kind of groggy." D.M.'s back was to the door. D.M. testified that she heard someone come in but she did not turn over. At that time, D.M. did not speak to the individual that entered the room. D.M. heard the individual take his clothes off and then she heard some "paper rattling[.]" When asked what the paper sounded like, D.M. testified that, "It sounded like a condom, maybe[.]" D.M. testified she thought it might be a condom because "at first I heard it and then I could just tell movement being made." D.M. clarified that she drew that conclusion based on "the way his body [was] shifting and he's getting into the bed at the same time, it's kind of like a fluid motion." D.M. further testified that the condom "kind of alarmed [her]" because Massey had not used a condom on the prior occasions when they had had sex. D.M. further testified that the last time she and Massey had had sex was that morning.

{¶14} D.M. did not turn over or sit up when the individual crawled into bed with her. D.M. described the incident as follows:

"[W]hen he got in, he just got right close to my body. I had on underwear. And I was -- he just pulled my underwear down, and he was really aggressive, though.

"And since I was still on my side, he kind of pushed my cheeks out and just put his – he put his penis in and then he also put his finger in my [anus] at the same time."

When asked if she thought it was Massey, D.M. testified, "I really did, yeah. I'm just thinking he's very aggressive." D.M. realized it was not Massey when she heard the intruder speak. D.M. testified, "I was scooting away and he was still trying to get in, and he said, 'Roll that pussy,' and I knew then that is wasn't [Massey's] voice. And I was, like, who -- I just – I mean ***." D.M. then tried to flip over. She testified, "[I]t really happened so fast. As soon as he

said that, I knew. I already had a feeling that something was wrong, anyway, because it was just too aggressive[.]"

{¶15} When D.M. asked the intruder who he was, he responded by saying, "Shut the f*** up." D.M. tried to strike the intruder as she cried out, "Help, help. Who the f*** are you? Why the f*** are you doing this to me?" D.M. continued to strike her intruder and they got into a "tussle." D.M. testified that she was on her back during a portion of the struggle while the intruder was on top of her. D.M. testified that the intruder had both hands on her neck and she screamed as she attempted to fight him off. D.M. was eventually able to knee the intruder and she was able to get to her feet. As both D.M. and the intruder ran for the door, the intruder pushed D.M. into a mirror on a closet door and it shattered. The intruder then proceeded to run down the steps. After the intruder left, D.M. called 911.

{¶16} Reviewing the aforementioned evidence in the light most favorable to the State, this Court concludes that any rational trier of fact could have found the essential elements of the charge of rape were proved beyond a reasonable doubt. See *Galloway*, supra. Kelley lured Massey away from his home. Kelley then misled Massey into believing that he wanted to borrow his truck to go to a restaurant to get something to eat. Kelley then used the truck to drive to Massey's house where D.M. was staying. Kelley proceeded to enter the bedroom where D.M. was sleeping and removed his clothing and put on a condom. Kelley was not D.M.'s boyfriend and he did not make his identity known to her prior to inserting his penis into her vagina and digitally penetrating her anus. D.M. testified that prior to the sexual conduct, she did not see Kelley and she did not hear his voice. While D.M. was awake, but "groggy," at the moment of the incident, she was not aware of who had crawled into her bed. Kelley took no overt action to inform D.M. that he was someone other than her boyfriend, Massey. During the course of the

incident, D.M.'s will was completely overcome by Kelley's concealment of his identity and his aggressive, swift, and deceptive conduct. Kelley engaged in sexual conduct with D.M. without ever giving her a chance to consent to the encounter. Accordingly, the evidence presented at trial, when construed in the light most favorable to the State, was sufficient to demonstrate that Kelley raped D.M.

{¶17} The first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

"THE TRIAL COURT ERRED BY ALLOWING A POLICE DETECTIVE TO TESTIFY REGARDING THE ALLEGED VICTIM'S VERACITY."

### ASSIGNMENT OF ERROR III

"TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO SPECIFICALLY OBJECT TO A POLICE DETECTIVE'S TESTIMONY REGARDING THE VERACITY OF THE ALLEGED VICTIM [IN VIOLATION OF THE] SIXTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION, AND SECTION 10, ARTICLE I, OHIO CONSTITUTION."

{¶18} This Court addresses Kelley's second and third assignments of error together as both focus on the testimony Detective Jason Hill.

{¶19} In his second assignment of error, Kelley contends that the trial court improperly allowed Detective Jason Hill to testify regarding the veracity of D.M.[1] Kelley argues that Detective Hill explicitly testified as to D.M.'s veracity when he testified that he did not believe

---

[1] In support of his position that Detective Hill improperly testified as to the veracity of D.M., Kelley cites to two portions of the trial transcript (pp. 577-578 and 611-612). We note that pages 611-612 of the trial transcript contain the testimony of Detective Russ McFarland. We decline to consider the testimony of Detective McFarland as it is not pertinent to our analysis of whether Detective Hill improperly testified as to the veracity of D.M.

D.M. was lying. Kelley further asserts that Detective Hill implicitly testified as to D.M.'s veracity when he stated that, in his experience, people making false allegations do not follow through and testify at trial. Kelley concludes that such testimony is particularly inappropriate in cases such as this where the jury might view a police officer as an expert and the credibility of witnesses is a critical issue. In support of his position, Kelley relies on the authority of the Supreme Court of Ohio's decision in *State v. Boston* (1989), 46 Ohio St.3d 108. Kelley also points to the Second District's decision in *State v. Tobin*, 2d Dist. No. 2005 CA 150, 2007-Ohio-1345, and the Eighth District's decision in *State v. Potter*, 8th Dist. No. 81037, 2003-Ohio-1338. In his third assignment of error, Kelley argues that defense counsel provided ineffective assistance by failing to properly object to Detective Hill's testimony. Kelley contends that there is a reasonable probability that the result of the trial would have been different but for trial counsel's failure to properly object.

**Testimony**

{¶20} We note that in support of his third assignment of error relating to the ineffectiveness of trial counsel, Kelley concedes that while defense counsel did object to Detective Hill's testimony on the basis of relevance, defense counsel did not object on the basis that Detective Hill was impermissibly vouching for D.M's veracity. Specifically, Kelley notes, "Trial counsel did object during Detective Hill's testimony[,] [b]ut that objection was based upon general relevancy, and not the fact that the detective was impermissibly vouching for D.M.'s truthfulness." Thus, we must review the admission of the testimony under a plain error standard of review. *State v. Latham*, 9th Dist. No. 07CA0067-M, 2008-Ohio-3050, ¶8.

{¶21} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To constitute plain

error, the error must be obvious and have a substantial adverse impact on both the integrity of, and the public's confidence in, the judicial proceedings. *State v. Tichon* (1995), 102 Ohio App.3d 758, 767. A reviewing court must take notice of plain error only with the utmost caution, and only then to prevent a manifest miscarriage of justice. *State v. Bray*, 9th Dist. No. 03CA008241, 2004-Ohio-1067, at ¶12. This Court may not reverse the judgment of the trial court on the basis of plain error, unless appellant has established that the outcome of trial clearly would have been different but for the alleged error. *State v. Kobelka* (Nov. 7, 2001), 9th Dist. No. 01CA007808, citing *State v. Waddell* (1996), 75 Ohio St.3d 163, 166.

{¶22} It is settled law that the judge of the veracity of a witness is solely the trier of facts. *State v. DeHass* (1967), 10 Ohio St.2d 230. An expert is prohibited from invading the territory of the jury by interjecting his or her opinion concerning the truthfulness of the statement of any witness because such opinion could be prejudicial. *State v. Boston* (1989), 46 Ohio St.3d 108. A review of the record in this case reveals that Kelley suffered no prejudice that he did not bring upon himself.

{¶23} Kelley's second and third assignments of error focus on Detective Hill's testimony on redirect examination. Before considering whether this testimony was properly admitted, we must look at the scope of the prior testimony which led to the exchange in question.

{¶24} Both the State and Kelley elicited extensive testimony from Detective Hill at trial. Detective Hill is assigned to the investigative major crimes unit at the Akron Police Department. On direct examination, Detective Hill testified that he has received specialized training in critical incident stress debriefing and management. On the night of the incident, Detective Hill reported to 1047 Frederick Blvd., in Akron, in response to a rape in progress call. Upon arrival, Detective Hill surveyed the crime scene with other officers and reviewed the evidence that had been

collected. Detective Hill also spoke with D.M. and Massey, who arrived at his house while the investigation was in progress. When D.M. gave her statement to Detective Hill, she was crying and remained very upset about the incident. Detective Hill recounted D.M.'s statement that she gave at the scene. When Detective Hill finished at the scene, he proceeded to the McDonald's in hopes of locating Kelley. Detective Hill then testified as to the sequence of events which eventually led to his coming into contact with Kelley. Detective Hill also testified in detail regarding his participation in the subsequent interrogation of Kelley at the police station. A recording of Kelley's interview with Detective Hill and his partner was played for the jury at trial.

{¶25} On cross-examination, defense counsel asked numerous questions regarding the investigation and, in particular, the techniques employed during the interrogation of Kelley. In regard to interrogation techniques, Defense counsel asked, "In, fact, you lie to get at the truth?" Detective Hill responded, "We're allowed, yes." When defense counsel asked if the interrogation could be described as "two cops asking [Kelley] over and over ad nauseam for nearly three hours the same questions[,]" Detective Hill responded in the affirmative. With respect to Kelley's truthfulness in answering questions, defense counsel asked, "And it's no question he's evasive and he tells a lie. You know that, don't you?" Detective Hill responded, "Absolutely."

{¶26} Defense counsel then proceeded to ask a series of questions regarding why D.M.'s story did not receive the same level of scrutiny as Kelley's story. Defense counsel asked, "[D]o you find it curious or reason for pause that the accuser tells you she calls her boyfriend three times but with no answer, and then you find out that her boyfriend's phone is out of service?" Detective Hill testified that he found that to be "a little bit curious." After asking questions

relating to other alleged inconsistencies in D.M.'s story, Defense counsel then asked Detective Hill if he found it to be "a bit peculiar that the accuser does not know the difference between her boyfriend and a man five inches taller?" Detective Hill answered that, under the circumstances, he did not find it peculiar. Detective Hill subsequently testified that he viewed D.M.'s statements in light of the fact that she had just been traumatized. Defense counsel asked Detective Hill if he documented whether he followed up with D.M. to check out inconsistencies in her story, to which Detective Hill answered, "No, I did not." Defense counsel then asked Detective Hill if he would refer to D.M. as a "victim" despite the fact that the jury had not retuned their verdict and "the fact that there are inconsistencies and peculiarities that you admit to[?]" Detective Hill responded, "Yes."

{¶27} Defense counsel then proceeded to ask a series of questions which placed the veracity of D.M. at issue.

"Defense Counsel: And I'm not suggesting that you're not a fair guy.

"Detective Hill: I understand.

"Defense Counsel: I'm not saying that. However, in terms of being fair with treatment you'd have to agree with me, you don't know what happened that day because you weren't there, correct?

"Detective Hill: That is correct.

"Defense Counsel: And it is possible D.M.'s lying?

"Prosecutor: Objection.

"The Court: Overruled.

"Detective Hill: There is a possibility.

"Defense Counsel: And there are some things that suggest her story as she relates to you makes one wonder, agree?

"Prosecutor: Objection.

"The Court:                  Overruled.

"Detective Hill:           If you're saying do I believe her story?

"Defense Counsel:      I didn't ask you that.  Makes one wonder.

"Detective Hill:           There's wonder in everything.

"Defense Counsel:      Sure.

"Detective Hill:           I can't – I can't answer that question.

"Defense Counsel:      Okay.  There are some details that one could get a bit obscure or fuzzy.  I can appreciate that, can't you?

"Detective Hill:           Yes.

"Defense Counsel:      But when you say that I called someone three times without answer and their phone is not in service, is that an inconsistency or a lie?

"Detective Hill:           I would say that that would be more of an inconsistency."

**{¶28}** Defense counsel went on to elicit a great deal of additional testimony from Detective Hill regarding his decision to accord varying levels of scrutiny to the statements of Kelley, Massey, and D.M.  Defense counsel and Detective Hill had the following exchange:

"Defense counsel:       "Okay.  How long was the interview with the accuser that you had?

"Detective Hill:           Are you talking about me, personally?

"Defense counsel:       Yes.

"Detective Hill:           I'd probably say 15, 20 minutes.

"Defense counsel:       And a lie is a lie, isn't it?

"Detective Hill:           Sure.

"Defense Counsel:      And each lie that a person tells makes the person asking the questions more suspicious; wouldn't you agree?

"Detective Hill:           Rephrase that.

"Defense Counsel:    Each lie that the person tells makes the person asking the questions more suspicious; wouldn't you agree with that?

"Detective Hill:    That is correct.

"Defense counsel:    And the fact that Mr. Kelley lies, the more he tells, the more suspicious or more of a suspect he becomes in you all's mind; isn't that true?

"Detective Hill:    Yes."

{¶29}  Defense counsel later asked Detective Hill a series of questions regarding whether certain individuals had left details out of their original statements.  Immediately after asking whether Massey had left certain details out of his original statement to police, defense counsel asked, "[W]hat portion of [D.M.'s] statement do you think she left out?"  Detective Hill testified, "Maybe about -- if she left out anything it would probably be her statement about running into the mirror, or following the person to the steps and then calling 911."  Defense counsel then asked Detective Hill if he should have placed D.M.'s statement under a greater amount of scrutiny.  Detective Hill responded in the negative.

{¶30}  Subsequent to the aforementioned testimony, the State engaged in the following line of questioning with Detective Hill on redirect examination:

"Prosecutor:    You were asked extensively about what you thought about the inconsistencies, as [defense counsel] put it, in the victim's statement yesterday.  Did you think she was lying?

"Detective Hill:    No.

"Prosecutor:    Have you been involved in cases where a victim changes their story, comes back and says, 'You know what? It didn't happen,' or, 'I was lying at first'?  Have you been involved in cases like that?

"Detective Hill:    Yes.

"Prosecutor:    And what usually – how does that usually happen?  When do they come forward and say, 'You know what?  It didn't happen'?

| | |
|---|---|
| "Defense Counsel: | Objection, Your Honor. It's not relevant to what happened here. |
| "The Court: | Well, I'm going to allow it. |
| "Detective Hill: | Throughout my career, normally, when a victim changes her story, it's usually when it comes time for trial." |

**{¶31}** In this case, defense counsel opened the door for the State to ask questions regarding the victim's veracity by eliciting testimony regarding the victim's veracity on cross-examination. On cross-examination, defense counsel asked Detective Hill whether D.M. might be lying. Defense counsel also highlighted possible inconsistencies in D.M.'s statement and asked Detective Hill why he did not place those inconsistencies under a greater amount of scrutiny. Defense counsel further asked Detective Hill if the details of D.M.'s story "makes one wonder" if it was true. Defense counsel asked another question which directly solicited Detective Hill's perception of whether certain statements made by D.M. were lies. In turn, on redirect examination, the State inquired as to whether Detective Hill believed that D.M. had been lying. The State also inquired as to Detective Hill's experience with victims who change their stories and why Detective Hill did not treat the story of the alleged victim in this case with a higher degree of scrutiny. As Kelley opened the door to questioning regarding the victim's veracity on cross-examination, the State was permitted to explore that line of questioning on re-direct examination. See *State v. Huff* (2001), 145 Ohio App.3d. 555, 560. Given the scope of Detective Hill's testimony on cross-examination, the testimony of Detective Hill on redirect examination did not result in a manifest miscarriage of justice. Thus, the trial court did not commit plain error.

**{¶32}** The second assignment of error is overruled.

**Ineffective Assistance of Counsel**

{¶33} In order to prevail on a claim of ineffective assistance of counsel, Kelley must show that "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." *State v. Reynolds* (1998), 80 Ohio St.3d 670, 674, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Thus, a two-prong test is necessary to examine such claims. First, Kelley must show that counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably. *State v. Keith* (1997), 79 Ohio St.3d 514, 534, citing *Strickland*, 466 U.S. at 687. Second, Kelley must demonstrate that but for counsel's errors, there is a reasonable probability that the results of the trial would have been different. Id.

{¶34} The Supreme Court of Ohio has recognized that a court need not analyze both prongs of the *Strickland* test, where the issue may be disposed upon consideration of one of the factors. *State v. Bradley* (1989), 42 Ohio St.3d 136, 143. Specifically,

> "'Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing in one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.'" *Bradley*, 42 Ohio St.3d at 143, quoting *Strickland*, 466 U.S. at 697.

**{¶35}** It is well-settled that, "debatable trial tactics do not give rise to a claim for ineffective assistance of counsel." *State v. Hoehn,* 9th Dist. No. 03CA0076-M, 2004-Ohio-1419, at ¶45, citing *State v. Clayton* (1980), 62 Ohio St.2d 45, 49. Even if this Court questions trial counsel's strategic decisions, we must defer to his judgment. Id. The Ohio Supreme Court has stated:

> "'We deem it misleading to decide an issue of competency by using, as a measuring rod, only those criteria defined as the best of available practices in the defense field.' *** Counsel chose a strategy that proved ineffective, but the fact that there was another and better strategy available does not amount to a breach of an essential duty to his client." Id., quoting *State v. Lytle* (1976), 48 Ohio St.2d 391, 396.

**{¶36}** Defense counsel's performance in this case was not objectively deficient. As noted above, defense counsel sought to employ a trial strategy that called the veracity of D.M into question. On cross-examination, defense counsel asked a series of questions aimed at soliciting Detective Hill's impression of whether D.M. had been truthful. Defense counsel highlighted possible inconsistencies in D.M.'s statement and inquired as to why Detective Hill did not scrutinize those inconsistencies. Defense counsel went on to directly ask Detective Hill if certain statements D.M. made were inconsistencies or lies. As defense counsel sought to put the veracity of D.M. into question while cross-examining Detective Hill, defense counsel was merely acting in accordance with that trial strategy when he declined to object on the basis that the State's line of questioning regarding D.M.'s veracity was improper. While the trial tactics employed by defense counsel did not ultimately prove to be successful, it cannot be said that their use amounted to a breach of an essential duty to Kelley. *Lytle*, 48 Ohio St.2d at 396.

**{¶37}** Kelley's third assignment of error is overruled.

III.

**{¶38}** Kelley's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

WHITMORE, J.
CONCURS

DICKINSON, J.
CONCURS IN JUDGMENT ONLY

APPEARANCES:

JEREMY J. MASTERS, Assistant State Public Defender, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.